103 N.J. Super. 324 (1968)
247 A.2d 161
HARRY L. TILLBERG, t/a RITZ BILLIARD ACADEMY, PLAINTIFF,
v.
TOWNSHIP OF KEARNY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND THE MAYOR AND COUNCIL OF THE TOWNSHIP OF KEARNY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 15, 1968.
*327 Mr. Stanley Stern for plaintiff (Mr. David S. Greenberg, attorney).
Mr. Paul J. McCurrie attorney for defendants.
LYNCH, J.S.C.
Plaintiff is the owner and operator of a billiard parlor in the Town of Kearny, New Jersey, and has been such since on or about March 15, 1964. In 1929 the town had adopted an ordinance providing for the licensing and regulating of billiard parlors. Prior to plaintiff's acquisition of the business involved, he applied to the town council *328 and received a license to operate. Having thus secured the license, plaintiff purchased the business. It is conceded that the premises were then, as they are now, in violation of section 8 of the ordinance which provides that no license shall be issued to conduct such a business where the place where it is to be conducted is below the surface of the adjoining street, and also in violation of section 6 in that the interior of the premises are not open to full view by the public, either from the street or the hall or corridor of the place where the business is conducted. It is further conceded that the same conditions had existed in violation of the ordinance since 1936, but annual licenses had nevertheless been issued ever since. On June 1, 1964 plaintiff entered into a new five-year lease agreement for the premises at a monthly rental of $110. The license was renewed for the years 1965, 1966 and 1967.
On January 2, 1968 plaintiff applied for renewal of the license for that calendar year, whereupon he was advised that a public hearing would be held on February 4, 1968 concerning his application. Such a hearing was held, and on May 8, 1968 the mayor and council adopted a resolution refusing to renew plaintiff's license. Essentially, four reasons were given for the denial: (a) the premises attract young people who create disturbances, trespass on adjacent property and generally have a detrimental effect upon the peace and welfare of the town; (b) the premises violate the subject ordinance in that the interior is not open to full view by the public from the street or hall or corridor of said premises, as required by section 6 of the ordinance; (c) the premises are situated below the surface of the adjoining street, a violation of section 8, and (d) plaintiff had been fined for permitting a 15-year-old boy to play billiards on the premises on May 6, 1967, in violation of N.J.S. 2A:170-54.
Plaintiff attacks the action of the town in refusing renewal of the license, essentially on these grounds: (1) the subject ordinance constitutes an unreasonable and arbitrary exercise of the delegated powers of the town; (2) it fails to contain appropriate standards to guide the town authorities in the *329 issuance or renewal of a license; (3) the licensing provisions, being invalid, are so intimately related to the ordinance as a whole as to render it void; (4) the town is estopped from refusing to renew the license because of noncompliance of the premises with the physical requirements of the ordinance, sections 6 and 8, and (5) the denial of plaintiff's application for a billiard parlor license was arbitrary, unreasonable and capricious. Plaintiff's contentions will be treated in order.

(1)

The reasonableness of the ordinance as a regulation of billiard parlors
Plaintiff's first argument rests in part on the contention that in modern times it is unreasonable to regulate billiard parlors and that their alleged capacity for evil is a relic of bygone days. He would thus belittle the alleged evils of "pool" parlors, much as was so delightfully done by the show-tune, "Trouble in River City,"[1] whose lyrics equated "trouble" with "pool," but by hyperbolic artistry clearly carried the message that such relationship existed only in the minds of the credulous and naive. Defendant town, on the other hand, cites Murphy v. State of California, 225 U.S. 623, 32 S.Ct. 697, 56 L.Ed. 1229 (1912), which held that billiard parlors have inherent possibilities for evil arising from the tendency of young people to loiter therein, the encouragement of idleness and with attendant further possibilities of wrongful conduct clandestinely carried on.
It may be that the potentials for evil in billiard parlors today are not the same as they were in 1912. The difference may be only in kind. We cannot be blind to the possibility that public pool parlors may be the situs of gambling (cf. Feder v. McCaffrey, 110 N.Y.S.2d 488 (Sup. Ct. 1952)), lottery or, more relevant to today's problems, perhaps the purveying or use of drugs. Though there is no evidence *330 of such use here, the feasibility thereof is the relevant consideration. The concept of Murphy v. State of California, supra, has been endorsed as the public policy of this State by N.J.S. 2A:170-54, which ordains that billiard parlors are not appropriate for the attendance of young people under the age of 16. To that end they may be regulated by facilitating surveillance by the police.
Despite the entertaining appeal of "Trouble in River City" that only the credulous find evil in pool, ordinances such as that here involved are aimed, as was said in Murphy, not at the game but at the place. In any event, N.J.S.A. 40:52-1(f) expressly delegates to municipalities the power to regulate billiard parlors. The exercise of legislative judgment in this respect is not subject to judicial superintendence unless plainly beyond the realm of police power or palpably unreasonable. State v. Mundet Cork Corp., 8 N.J. 359 (1952). The reasonableness is committed in the first instance to the municipal authorities. Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405 (1952).
The court cannot say that the regulation of billiard parlors contained in this ordinance, particularly sections 6 and 8 concerning the physical characteristics of the premises, is palpably unreasonable.[2] Such provisions as that the premises be open to view from outside and be at street level may serve to provide better surveillance by the police and prevent clandestine acts inimical to the general welfare of the municipality. The provisions are in furtherance of the policy established by N.J.S. 2A:170-54, supra. Whether this is desirable legislative judgment is for the local governing body to decide, and not this court.

(2)

The sufficiency of "standards" for licensing
With respect to plaintiff's contention that the ordinance is lacking in sufficient "standards" for the issuance of a *331 license, it is noted first that sections 2(2) and 2(3) provide that no license may issue unless "the Chief of Police approves in writing and application," and that the Council "approve said application."
It is well settled that a licensing ordinance vesting discretion in municipal officials to issue or deny a license must contain appropriate standards to govern such decisions. Moyant v. Borough of Paramus, 30 N.J. 528 (1959); Weiner v. Borough of Stratford, County of Camden, 15 N.J. 295 (1954); Finn v. Municipal Council of City of Clifton, 136 N.J.L. 34 (E. & A. 1946); Lipkin v. Duffy, 119 N.J.L. 366 (E. & A. 1937); Jersey City Merchants Council v. Jersey City, 71 N.J. Super. 156 (App. Div. 1961); Gross v. Allan, 37 N.J. Super. 262 (App. Div. 1955); Mister Softee v. Mayor and Council of City of Hoboken, 77 N.J. Super. 354 (Law Div. 1962).
In Gross v. Allan, an ordinance of the Town of Kearny provided for the licensing of the business of selling motor vehicles on vacant land. It provided that the license shall not issue until after approval by the building inspector, the superintendent of the fire prevention bureau and the town council "after hearing thereon."[3] The court said:
"There is no escape from the essentiality of specific provisions plainly stating the norms or standards which are to guide and control the designated officials in determining whether the license shall be granted or denied. Weiner v. Borough of Stratford, 15 N.J. 295, 299 (1954); Township of Raritan v. Hubb Motors, Inc., 26 N.J. Super. 409, 410 (App. Div. 1953); Finn v. Municipal Council of City of Clifton, 136 N.J.L. 34 (E. & A. 1947); Rosenberg v. Board of Com'rs of City of Camden, 137 N.J.L. 505 (Sup. Ct. 1948). Defendants urge that the requirements for approval by the building inspector and the superintendent of the fire prevention bureau sufficiently imply an intent that the statutes and ordinances committed to their administrative enforcement should constitute the standards applicable. Cf. Kurinsky v. Board of Health, Lakewood Township, 128 N.J.L. 185, 187 (Sup. Ct. 1942). While the nature of the subject matter regulated may in a particular case warrant fairly *332 broad standards, Adams Theatre Co. v. Keenan, 12 N.J. 267, 274 (1953); Ward v. Scott, 11 N.J. 117, 123, 124 (1952), the legislative language should not leave any doubt as to what the standards are. The mere requirement of the approval of particular administrative or police officers does not spell out the standards, particularly where, as here, there is overlaid the requirement of approval by the governing body `after hearing', unaccompanied by specification of any kind of criterion upon which the decision at the hearing is to hinge. Finn v. Municipal Council of City of Clifton, supra (136 N.J.L., at pages 36, 37). Section 4 of this ordinance is defective on its face and invalid." (37 N.J. Super., at p. 268; emphasis added)
Defendants point to section 9 of the ordinance which reads as follows:
"Any license granted pursuant to the terms of this ordinance may be revoked by resolution of this Council upon hearing and for due cause such as failure to comply with any of the provisions of this ordinance * * *." (Emphasis added)
Defendants urge that since this section provides for revocation "for due cause," there is thereby established a sufficient standard for licensing, citing In re Berardi, 23 N.J. 485 (1957), and Ward v. Scott, 11 N.J. 117 (1952). In Berardi a private detective license had been issued to appellant, and after he had pleaded nolo contendere to a charge of having made a false and fraudulent income tax return, the license was revoked pursuant to N.J.S.A. 45:19-12 which authorized such revocation "for cause." The court there held that the statute providing for the granting of the license required certain standards with respect to character, competency and integrity of the person applying for the license, and that a sufficient standard was the testing of the known facts against the ordinary and generally accepted meaning of the words "good character, competency and integrity." In Ward v. Scott, supra, it was held that the question of "standards" must be decided in the light of the objects of the ordinance.
Measured by either of the tests suggested by Berardi and Ward, the instant ordinance is deficient. There is no requirement in the ordinance that before a person be granted *333 a license he must be of good character. All that is required upon the application is that he give his name, the names of the persons intending to conduct the business, their age and residence and, if a corporation, the names of the officers responsible for the conduct of the business. The granting of the license is entirely contingent upon the approval of the application by the chief of police and then the council. Their discretion is unbridled, and apparently could be withheld with or without any reason.
Further, section 9 provides for revocation after the license has been issued and after presumably some provision of the ordinance has not been complied with. Such regulations apply to the conduct of the business and provide for revocation after such conduct has failed to comply with certain provisions of the ordinance, such as permitting persons under the age of 16 on the premises (section 10) or prohibition of gambling (section 11). Such provisions can have no relation to the issuance of the license. Since the renewal of the license is subject entirely to the whim of the chief of police and the council in approving or not approving the application, in this respect it must be held that the ordinance is deficient as to standards.

(3)

Is the entire ordinance invalid because of deficiency in standards?
Having thus decided that the licensing provisions of the ordinance are invalid, there remains the question as to whether those provisions are so intimately related to the ordinance as a whole so as to render the entire ordinance invalid. The test of total invalidity was stated in Gross v. Allan, supra:
"The question of severability of the invalid provision is one both of legislative intent, * * * and of whether the remaining provisions are functionally self-sufficient as containing the essentials of a complete enactment, * * *. The two criteria must coexist." (37 N.J. Super., at p. 269)
*334 See also, Tagmire v. Atlantic City, 35 N.J. Super. 11 (App. Div. 1955). As said in Mister Softee, supra:
"In the ordinance in question the intent that the sections be severable is clear, but the problem is whether without the licensing provisions the ordinance makes sense. Without the licensing provisions, the ordinance is not self-sufficient. To eliminate the word license or licensee from the separate paragraphs of section 21:29 would leave the regulations a meaningless shell. To substitute another word in the place of licensee, such as vendor or peddler, to make the regulations meaningful, would be to rewrite the ordinance. This is not the duty of the courts but belongs strictly to the realm of the municipality. The words of Judge Goldmann are clearly applicable to this ordinance, `Since all the sections are intimately related and form an integrated whole, the entire ordinance must be held invalid.' Tagmire v. Atlantic City, supra." (77 N.J. Super., at pp. 378, 379)
An examination of this ordinance clearly leads to the conclusion that it is a licensing ordinance and that the regulatory portions, such as they are, are directly related to a "licensed" place. When the licensing provisions fall, so do the regulatory aspects. Section 1 of the ordinance prohibits the conduct of the pool business without a license. The regulations contained in sections 3, 7, 8, 9, 10, 11 and 14 govern the place which is "licensed" by express reference to the license or place licensed. Without the licensing provision the ordinance is not self-sufficient, and it is therefore concluded that the entire ordinance is invalid.

(4)

Assuming that sections 6 and 8 of the ordinance are severable, is the municipality estopped from refusing a license because of violations thereof?
If it be argued that sections 6 and 8 are severable and remain viable despite the holding above that the entire ordinance is invalid, we come to plaintiff's contention that, granting that the physical condition of the premises violated those sections, defendant town is nevertheless estopped to assert such violations as ground for refusal to renew the license. *335 The basic factual support for plaintiff's contention lies in the fact that for at least 31 years a license has been issued for the premises although they were in violation of sections 6 and 8; that before plaintiff invested his money in the business involved he obtained a license and thereafter entered into a five-year lease for the premises, after which the license was renewed for the years 1965, 1966 and 1967  during all of which time the premises were in the same condition now asserted as one of the grounds for refusing renewal.
The town asserts that a governmental body cannot be estopped "by acts of its officers and agents" for violation of positive law. It cites Adler v. Department of Parks, etc., Irvington Tp., 20 N.J. Super. 240 (App. Div. 1952), and Giordano v. Mayor and Council of Borough of Dumont, 137 N.J.L. 740 (E. & A. 1948).
The line between acceptance of the doctrine of estoppel against a municipal corporation and the inherent aversion thereto is not clear. Some of this confusion springs from the dichotomy created by the decision in Freeman v. Hague, 106 N.J.L. 137 (E. & A. 1929), and such cases as Dickinson v. Inhabitants of Plainfield, 13 N.J. Misc. 260, 176 A. 716 (Sup. Ct. 1935), affirmed 116 N.J.L. 336 (E. & A. 1936); Home Fuel Oil Co. v. Borough of Glen Rock, 118 N.J.L. 340 (Sup Ct. 1937); Giordano v. Mayor and Council of Borough of Dumont, supra, and Adler v. Department of Parks, etc., Irvington Tp., supra.
In Freeman, by a vote of 8 to 6, the Court of Errors and Appeals held that where a board of commissioners of a city recommended the granting of a building permit, even though improperly, and the permit had been granted, the board is without lawful power to revoke the permit after the owner had acted upon the faith of it by expenditure of moneys in the prosecution of work, and had entered into contractual relations with builders for the erection of a building pursuant to the permit.
Freeman was followed by the opinion of then Justice Case in Dickinson v. Inhabitants of City of Plainfield, supra. In *336 that case the property owners applied for and were granted a permit by the building inspector to make alterations to convert their automobile showroom use to a service station. After some moneys were expended and alterations were made the permit was rescinded as improperly allowed because in violation of the local ordinance. It was held that the building inspector had no authority to grant such permit and the town was not estopped from rescinding the permit. Justice Case distinguished Freeman v. Hague by saying that in the latter case the permit had been issued "by a duly qualified municipal body" but in the case before him the permit had merely been issued by an officer who did not have the authority to issue it.
Home Fuel Oil Co. v. Borough of Glen Rock and Adler v. Department of Parks, etc., Irvington Tp., likewise are cases in which an official, as distinguished from a governing body itself, had issued permits, after which they were revoked by the governing bodies. In both of those cases Freeman was distinguished by specific reference to Justice Case's distinction of Freeman, made in Dickinson v. Inhabitants of City of Plainfield, supra.
In Giordano v. Mayor and Council of Borough of Dumont, supra, the building inspector of the town issued a permit for the erection of a gasoline station in violation of the zoning ordinance which prohibited such use. Relying on that permit, the property owner incurred obligations. Thereafter, when a new building inspector took office, the violation was noticed and the permit was revoked. Plaintiff claimed that the municipality was estopped from denying the validity of the action of the building inspector in issuing the permit, relying on Freeman v. Hague. Again the court distinguished Freeman by saying: "That decision does not apply to the instant matter as it dealt with the building permit granted by a duly qualified body prior to the passage of the Zoning Act, R.S. 40:55-1 et seq." (Emphasis added).
An analysis of the foregoing decisions suggests that the decision in Freeman subsists, unrepudiated, insofar as *337 it holds that where a permit has been granted by a "duly qualified municipal body," as distinguished from an unauthorized issuance of a permit by an officer or agent of a municipality, the municipality is estopped from revoking the permit (assuming, of course, that the elements of estoppel, such as reliance and change of position, are shown).
In this case the license for these premises had been issued for the prior 31 years, not by a mere officer or agent of the municipality, but, pursuant to section 13 of the ordinance, after approval by the town council itself. Therefore, Freeman v. Hague is applicable and estoppel is not precluded by the decisions in Dickinson, Home Fuel Oil, Giordano, or Adler.
The court is not unmindful of the fact that it has been said by respectable authority that Freeman v. Hague has been "repudiated" in later cases, Adler v. Department of Parks, etc., Irvington Tp., supra, and that though it "has never been overruled * * * it has been distinguished into disgrace." 9 Rutgers L. Rev. 716 (1954-55); 13 Rutgers L. Rev. 90 (1958-59). The latter article recognizes the confusion in this area. On the other hand, in Kurowski v. Board of Adjustment of City of Bayonne, 11 N.J. Super. 433 (1951), the Appellate Division, quoting verbatim the opinion below of then Law Division Judge Brennan, adopted his suggestion, based on citation of Tim v. City of Long Branch, 134 N.J.L. 285 (Sup. Ct. 1946), affirmed 135 N.J.L. 549 (E. & A. 1947), that the doctrine of Freeman v. Hague may apply where the proofs are convincing of the good faith of expenditures made on the strength of an unauthorized permit and where the equities dictate application of estoppel. In 9 Rutgers L. Rev. 717 (1954-55) it was said that there was reserved for the future the question whether the rule enunciated in Adler is qualified by the exception suggested in Kurowski. So far as this court has beeen able to discover this doubt has not yet been relieved. It may be that this case, at this or another level, may serve to shed some light.
*338 Whatever doubt may remain, it is clear that Judge Brennan's suggestion, that Freeman be applied where the equities are served, is consonant with the polestar established by the later decisions of our Supreme Court, i.e., that estoppel will apply against a municipal corporation where the interests of justice, morality and common fairness clearly dictate that course. See 405 Monroe Co. v. City of Asbury Park, 40 N.J. 457, 463 (1963); Gruber v. Mayor, etc., of Raritan Tp., 39 N.J. 1, 13 (1962), and Palisades Properties, Inc. v. Brunetti, 44 N.J. 117 (1965). Conversely, estoppel will not apply where the permittee is not in good faith. As Judge Brennan said (quoted at 11 N.J. Super. 441) the Dickinson, Home Fuel Oil and Lynch v. Hillsdale, 136 N.J.L. 129 (Sup. Ct. 1947), aff'd 137 N.J.L. 280 (E. & A. 1948) opinions all emphasize the undue speed and implicit bad faith with which the landowners in those zoning cases incurred obligations and expenses on the strength of the unauthorized permits. If we apply this measure to the acts of plaintiff here, no such opprobious connotation can be laid to them. On the other hand, in this court's view, justice, morality and common fairness dictate that defendant municipality should be estopped to claim that the physical characteristics of the premises, which it had accepted for 31 years, may now be asserted as ground for refusal to license the premises.
In V.F. Zahodiakin, etc., Corp. v Zoning Board of Adjustment of City of Summit, 8 N.J. 386 (1952), an "exception" to the zoning ordinance had been granted with the approval of the governing body of the City of Summit and when, nine years later, continuance of that exception was refused by that governing body, it was held by the Supreme Court that the city was not estopped to terminate the exception. However, the court there made the distinction between those actions of a municipal body which are wholly beyond its statutory power, and therefore ultra vires in the primary sense, and those actions which are within the municipality's delegated power but irregularly exercised, and *339 therefore ultra vires in the secondary sense. As to the former, there can be no estoppel. As to the latter, there may be. As Mr. Justice Heher said in Zahodiakin, the agreement made in 1952 by the City of Summit, whereby the landowner was purportedly granted an "exception" to the zoning ordinance, was clearly beyond the power of the municipality because it violated the statute which authorized the granting of such an exception. The action was "extra" the statute and was not even professed to be in exercise of the statutory power. It was not a mere irregular exercise of a function residing in the local authority but was "wholly beyond the statute." Therefore the action constituted an excess of jurisdiction, was utterly void and there could be no estoppel against the municipality's revocation of its prior action. The distinction thus made was stated in Summer Cottagers' Ass'n of Cape May v. City of Cape May, 19 N.J. 493 (1955):
"There is a distinction between an act utterly beyond the jurisdiction of a municipal corporation and the irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional. The former are ultra vires in the primary sense and void; the latter, ultra vires only in a secondary sense which does not preclude ratification or the application of the doctrine of estoppel in the interest of equity and essential justice. Compare Jersey City Supply Co. v. Jersey City, 71 N.J.L. 631 (E. & A. 1905); Los Angeles Dredging Co. v. City of Long Beach, 210 Cal. 348, 291 P. 839, 71 A.L.R. 161 (Sup. Ct. 1930); Continental Construction Co. v. City of Lawrence, 297 Mass. 513, 9 N.E.2d 550 (Sup. Jud. Ct. 1937), 111 A.L.R. 699; Town of Holbrook v. Girand, 52 Ariz. 291, 80 P.2d 695, 118 A.L.R. 1203 (Sup. Ct. 1938); State ex rel. Bayer v. Funk, 105 Or. 134, 199 P. 592, 209 P. 113, 25 A.L.R. 625 (Sup. Ct. 1922); Bell v. Kirkland, 102 Minn. 213, 113 N.W. 271, 13 L.R.A., N.S., 793 (Sup. Ct. 1907)." (at pp. 504-505)
In Summer Cottages', a sale of public lands was made in violation of the governing statute (N.J.S.A. 40:60-26). It was held that, while the sale was in violation of the statute, it was "within the municipality's essential jurisdiction" (p. 506) and estoppel applied, especially where "equity and elemental justice" dictated application of estoppel.
*340 Likewise, in the instant situation, the granting of the license through the several years by the defendant municipality was within its delegated power. The power to license and regulate billiard parlors is expressly granted to the municipality by our N.J.S.A. 40:52-1. It therefore was not an act ultra vires in the primary sense, but rather only in the secondary sense and estoppel should be applied where equity and justice require it.
It is true that mere failure to enforce an ordinance against a violator, without more, will not estop a municipal corporation from later enforcing it. Leigh v. City of Wichita, 148 Kan. 607, 83 P.2d 644, 119 A.L.R. 1503 (Sup. Ct. 1938). But as said in the annotation to that case, 119 A.L.R., at p. 1511:
"It was pointed out [in Leigh] that the case was not one in which the application of the doctrine of estoppel against a municipality was required by justice and right, as where positive acts of city officials induced the action of the persons against whom the city was proceeding."
And see Kennedy v. City of Newark, 29 N.J. 178 (1959), where mere failure to enforce an ordinance requiring city residence of its employees was held not sufficient to estop the city from enforcing it at a later time. But Chief Justice Weintraub carefully pointed out that the facts therein did not suggest the issue: "There is no evidence of a studied policy not to enforce the ordinance. * * * Quite obviously the missing link is official knowledge of violations of the ordinance." (at p. 192). Not so here. The positive acts of defendant governing body in granting the license for many years despite noncompliance with sections 6 and 8 were clearly acts which induced plaintiff to invest in his business, and the annual attention to renewal for those years did indicate a studied policy not to enforce the ordinance against plaintiff. It cannot be said that there was a "missing link" of official knowledge of the violation.
*341 In Feder v. McCaffrey, 110 N.Y.S.2d 488 (Sup. Ct. 1952), petitioner had operated a billiard parlor for six years and had received annual licenses. The commissioner of licenses denied renewal because of three arrests over the last four years, all of which were dismissed. The court, reversing the denial of the license, said:
"The harshness and unfairness of respondent's arbitrary act is manifest from the fact that the license was renewed each year after respondent was cognizant of the complaints and arrests and alleged character of the neighborhood; that after the arrests of petitioner's brother in 1950 the license was at first suspended and then reinstated; that thereafter, relying on such reinstatement, petitioner committed himself to a five year lease and that since such reinstatement there was no complaint or arrest made, but, on the contrary, the Police survey revealed no evidence of gambling or illegal activities. Though the issuance of a license affords no contractual rights, petitioner is entitled to the aegis of and protection by the Court and to have it intervene and shield him from the arbitrary, capricious and unreasonable conduct of the respondent." (at p. 494; emphasis added)
So here, this court believes that the overriding principle which governs with respect to estoppel is that stated in the more recent decisions of our Supreme Court as cited above and as put in Palisades Properties, Inc. v. Brunetti, 44 N.J. 117 (1965):
"Municipalities, like individuals, are bound by principles of fair dealing, Hankin v. Hamilton Twp. Bd. of Education, 47 N.J. Super. 70, 78 (App. Div. 1957). Equitable principles of estoppel will be applied against municipalities `where the interests of justice, morality and common fairness clearly dictate that course.' 405 Monroe Co. v. City of Asbury Park, 40 N.J. 457, 463 (1963); Gruber v. Mayor and Tp. Com. of Raritan Tp., 39 N.J. 1, 13 (1962); Tremarco Corporation v. Garzio, 32 N.J. 448, 458 (1960); Vogt v. Borough of Belmar, 14 N.J. 195, 205 (1954)." (at p. 131)
Under the circumstances of this case, the foregoing standards postulate that defendant municipality is estopped from asserting violations of sections 6 and 8 of the subject ordinance as a ground for denying renewal.

*342 (5)

Assuming the validity of the ordinance, on the evidence below, was the action of the municipality arbitrary, unreasonable and capricious?
Last, this court holds that the denial of the renewal of plaintiff's license was arbitrary and capricious insofar as it is based on the testimony at the public hearing of February 14, 1968, to the effect that plaintiff's billiard room is an "attraction for young people who frequently and regularly create disturbances, including the use of obscene language, obscene actions, arguments, fights, trespassing on adjacent premises and littering said premises with beer cans and other debris and in general detrimentally affecting the peace, tranquility and welfare of the Town's residents." The testimony in this respect, given by neighbors living in the vicinity of the pool parlor, was very vague. Some of them testified that after young people came out of the plaintiff's premises, indecent language was heard; that somewhere in the neighborhood indecent acts were observed; that on one or two occasions fights developed, and that autos driven by youths sped through the streets of the neighborhood. There was also some testimony that there was littering of the neighbors' premises.
In measuring the action of the local authority below as to whether it wis arbitrary or capricious there is necessarily incorporated that aspect of defendants' actions referred to in point (4) above, namely, refusal to renew by reason of violations of sections 6 and 8 of the ordinance though licenses had been issued despite such violations since 1936. This, too, is relevant as to whether the action below, in the entire context, was arbitrary or capricious.
With respect to the testimony of the neighbors as to "disorderly conduct" in the neighborhood of plaintiff's premises, the following language in Feder v. McCaffrey, supra, is pertinent:
*343 "* * * There is no factual showing that this petitioner is in any manner connected with or responsible for this alleged condition. * * * If it is respondent's theory that pool rooms per se are responsible for the breeding of crime, they should all be suppressed, but by legislative action after a proper legislative investigation. The remedy is not by the refusal by an administrative officer to renew a specific license of a pool room of an operator who has not been shown by facts to have been guilty of any wrongdoing. * * *" (110 N.Y.S.2d, at p. 493; emphasis added)
So here, there is no proof connecting this plaintiff with the conditions described. They were conditions that occurred in the neighborhood, but were not causally related to plaintiff's conduct of the pool parlor. Several police officers testified. The complaints received by the police were minimal. In fact, Sergeant Comer testified that the complaints from the neighbors were no more frequent in this neighborhood than in other places. Chief Mulligan testified that, while there were problems in this neighborhood related to cars racing through the streets, noise, screaming, hollering, etc., they were conditions which were common in other neighborhoods as well as this one. Police had never been called to the interior of the premises and, while they responded to several complaints of the neighbors, investigation failed to substantiate them. Chief Mulligan expressly testified that, if it were not for the physical aspects of the building, he would have to approve renewal of plaintiff's license.
The last asserted ground for the failure to renew the license was the fact that, on one occasion, plaintiff had been convicted of a violation of N.J.S. 2A:170-54, for allowing a 15-year-old boy to play pool on the premises. Such conviction occurred only once in the four years of plaintiff's conduct of the pool parlor, and he testified that it was difficult to say whether the particular boy was in fact over 16. Such an isolated violation was not, in this court's view, sufficient to deprive plaintiff of his means of livelihood.
In Katz v. Moss, 184 Misc. 133, 55 N.Y.S.2d 131, aff'd 269 App. Div. 854, 56 N.Y.S.2d 539 (Sup. Ct. 1944) plaintiff was denied a renewal of a license to operate a billiard *344 parlor for which he had received annual licenses for the previous 13 years. The asserted ground for the refusal to renew was that there had previously been several arrests made in the pool parlor for various illegal activities and that the Police Department had recommended that the license not be renewed. Of 15 arrests and one summons over a period of the years, on only two occasions were the patrons found guilty of disorderly conduct. The court reversed the denial of the license and said, at pp. 134, 135:
"Petitioner, as stated, has held this license under annual renewals since 1930. Into the business he has put his life's savings, presumably, for him, a considerable investment. For aught that appears to the contrary, he is a reputable citizen and member of the community, a married man with three children, one of whom is now serving as a member of our armed forces overseas. He remains liable under a four-year unexpired term of his lease at a substantial rental, for the premises occupied by him are at a location on Pitkin avenue, which is as busy as Fulton street, Broadway or any of the most important thoroughfares in Brooklyn. Property values there are as high as in exclusive shopping centers anywhere in the city. It is difficult to conceive of such a location as an attractive hide-out or lure for criminals, unless all poolrooms may be so deemed. In that event, none should be sanctioned. If the circumstances are otherwise, the police have proven singularly ineffective for, beyond abortive arrests which in themselves mean nothing, they have been able to establish nothing to the contrary in the past fourteen years." (Emphasis added)
The considerations stated by the court in Katz are likewise applicable here. So far as it is here made to appear plaintiff is a reputable citizen, married, with family, and his means of livelihood are involved in the subject pool parlor.
The court therefore holds that, based on the testimony below and in the context of the entire circumstances, the action of the Town Council was arbitrary, unreasonable and capricious.

CONCLUSION
For the foregoing reasons the action of the Town Council in denying renewal of a license to plaintiff herein is set aside and vacated.
NOTES
[1] From The Music Man.
[2] But see point (4) below.
[3] The approval of the chief of police and town council here does not provide even for a hearing.